IN RE LIQUIDATION OF ANCHOR STATE BANK: HOTEL WAUSAU COMPANY and others, Appellants, vs. BANKING COMMISSION and another, Respondents.

*March 11—April 9, 1940.*

For the appellants Hotel Wausau Company and Hotels, Inc., there were briefs by *Fish, Marshutz & Hoffman,* attorneys, and *I. A. Fish* and *W. H. Voss* of counsel, all of Milwaukee, and oral argument by *Mr. Fish* and *Mr. Voss.*

*Benjamin P. Galin* of Milwaukee, for the appellant Auto Acceptance Corporation.

For the respondents there was a brief by *Affeldt & Lichtsinn* of Milwaukee, and *Bouck, Hilton, Kluwin & Dempsey* of Oshkosh, and oral argument by *Ray C. Dempsey.*

WICKHEM, J. The facts in this case are not in dispute. The Anchor State Bank of West Milwaukee, whose deposits were insured by FDIC, was taken possession of by the Banking Commission as a delinquent bank on June 4, 1935. The commission proceeded to liquidate the bank. At the time of its closing Hotel Wausau had on deposit the sum of $10,000, Hotels, Inc., the sum of $5,169, and Auto Acceptance Corporation the sum of $7,986.69. Each filed claim with the commission and FDIC paid to each the amount of its insured deposit. This left balances of $5,000 in favor of Hotel Wausau Company, $169 in favor of Hotels, Inc., and $2,896.69 in favor of Auto Acceptance Corporation. The payment to the Hotel Wausau Company was on October 30,

1935, that to the Auto Acceptance Corporation on October 17, 1935, and that to Hotels, Inc., on May 29, 1937. Each of the appellants, as a condition to this payment, executed an assignment of claim against the Anchor State Bank to FDIC, and the latter executed a certificate certifying that each had executed a proof of claim against Anchor State Bank; that this claim had been assigned to FDIC; and that when FDIC should receive dividends on the claim to the extent of $5,000, and upon surrender of the certificate, it would reassign the claim to the depositor and further dividends would be payable to the depositor. The issue is whether FDIC is entitled to receive all dividends on the claims of appellants until it has been fully reimbursed for the amount paid by it to appellants on their insured deposits or whether appellants are entitled to share in the dividends with FDIC to the extent of the uninsured portions of their claims.

Appellants contend, (1) that the Federal Reserve Act of 1933 did not give FDIC a special right of subrogation; (2) that whether it did or not, the rights of the parties were governed by the provisions of the law as amended in 1935, and that such amendment does not give to FDIC a right of subrogation as broad as that allowed by the trial court; and (3) that the rights of FDIC to subrogation do not rest upon the assignment executed by appellants because, (a) these rights are created by statute and cannot be extended by agreement, and (b) an agreement purporting to give broader rights of subrogation than those provided by statute is void for want of consideration. These contentions require a consideration of the provisions of federal legislation creating the FDIC and providing for insurance of bank deposits.

Sec. 12B of the Federal Reserve Act was enacted in 1933 (sec. 264, title 12, U. S. Code) and created FDIC. After prescribing the purposes of the corporation and providing

for its governing board, there is appropriated the sum of $150,000,000 for subscription by the secretary of the treasury on behalf of the United States to capital stock of the corporation. It is provided that the capital stock of the corporation shall be divided into shares of $100 each, and that the stock shall be of two classes, class A and class B. It is provided that class A stock shall be held by member and nonmember banks, and that they shall be entitled to payment of dividends out of earnings at the rate of six per cent per annum, cumulatively, or to the extent of thirty per cent of the net earnings of any one year, whichever amount shall be greater, but that such stock shall have no vote at the annual meetings of stockholders. It is provided that class B stock shall be held by federal reserve banks only and not be entitled to the payment of dividends. It was required that every bank which is or becomes a member of the federal reserve system on or before July 1, 1934, shall take all steps necessary to enable it to become a class A stockholder on or before this date; that no state bank, trust company, or mutual savings bank shall be admitted to membership in the federal reserve bank until it becomes a class A stockholder; and that no national bank in the continental United States shall be granted a certificate authorizing it to commence the business of banking until it becomes a class A stockholder. The amount of stock subscriptions of class A stock are required to equal one half of one per cent of a bank's total deposit liabilities, except in the case of member banks organized after the effective date of the section. These banks are required to subscribe to stock equal to five per cent of their paid-up capital and surplus. The act provides for an examination into the solvency of every bank becoming a member or applying to become a member of FDIC and certification of solvency by the federal reserve board or comptroller of currency. Sec. 12B (1) provides that on or after July 1, 1934, the FDIC "shall insure as hereinafter provided the

deposits of all member banks, and on and after such date and until July 1, 1936, of all nonmember banks, which are class A stockholders of the corporation." In case of any closed national bank which is a class A stockholder the corporation is required to organize a new national bank to assume the insured deposit liabilities of the closed bank, receive new deposits, and perform temporarily the functions provided for in this paragraph. The insurance provided was one hundred per cent of all deposits not exceeding $10,000, seventy-five per cent of all deposits in excess of $10,000 but less than $50,000, and fifty per cent of deposits in excess of $50,000. The act provides that after payment of the deposit. liabilities *"the corporation shall be subrogated to all rights against the closed bank of the owners of such deposits and shall be entitled to receive the same dividends from the proceeds of the assets of such closed bank as would have been payable to each such depositor until such dividends shall equal the insured deposit liability to such depositor assumed by the new bank, whereupon all further dividends shall be payable to such depositor."* With respect to a closed state bank which is a class A stockholder, it is provided that the corporation shall accept appointment as receiver thereof if such appointment be tendered by the proper state authority and shall then organize a new national bank to assume the insured deposit liabilities, etc. The act then provides:

"Upon satisfactory recognition of the right of the corporation to receive dividends on the same basis as in the case of a closed national bank under this subsection, such recognition being accorded by state law, by allowance of claims by the appropriate state authority, by assignment of claims by depositors, or by any other effective method, the corporation shall"—

pay or make available to this new national bank an amount equal to the total insured deposit liabilities of the closed state bank. If the state law does not permit FDIC to be a re-

ceiver, it is nevertheless required to organize a new national bank and to proceed as theretofore indicated. In view of the fact that the permanent insurance was not to become available until July 1, 1934, there is provision in sec. 12B (y) for a temporary fund to insure deposits until July 1, 1934. This temporary insurance was only to the extent of $2,500 on the claim of any one owner of a deposit. The provisions for temporary insurance refer back to subsection (1) in this manner:

"The corporation shall proceed in accordance with the provisions of subsection (1) of this section to pay the insured deposit liabilities of such member. . . ."

Sec. 12B was amended by an act approved June 16, 1934, the entitled purpose of which was to extend for one year the temporary plan for deposit insurance and for other purposes. This act changed the amount of temporary insurance from $2,500 to $5,000. By joint resolution approved June 28, 1935, the temporary plan was extended to August 31, 1935.

So far as the provisions for permanent insurance are concerned, they plainly give to FDIC the subrogation rights accorded to it by the trial court. The provisions for subrogation to this extent are plain and unambiguous whether applied to national banks or to the state banks. The act contemplates that upon payment of an insured deposit liability FDIC either by operation of law, assignment, or otherwise is to be subrogated to the whole claim of the depositor until the corporation has recouped its insurance payments. Then and only then is the depositor to share in the dividends. This conclusion does not solve the problem, however, because of the fact that the provisions for permanent insurance in the original act were not in effect at the time when possession of the Anchor State Bank was taken by the Banking Commission. The rights of the depositors at the time of the closing of the bank were governed by the temporary in-

surance provisions and appellants rely upon the fact that sec. 12B (y) contains no specific provision for subrogation and claim that the reference back to subsection (1) is not sufficient to create in FDIC subrogation rights upon payments of insured deposits from the temporary fund. The contention cannot be sustained. It is obviously the legislative intent that the provisions of subsection 12B (1) shall in all respects govern the conditions under which temporary insurance is to be paid, and that this includes the subrogation provided for in this subsection.

By the act approved June 28, 1935, the temporary insurance plan was extended to August 31, 1935. By an act approved August 23, 1935, there was enacted the so-called "Banking Act of 1935." Sec. 12B was further amended. Subsection (1) provides that "the temporary federal deposit insurance fund and the fund for mutuals heretofore created pursuant to the provisions of this section are hereby consolidated into a permanent insurance fund for insuring deposits." The maximum amount of the insured deposit of any depositor was fixed at $5,000. The provisions contained in subsection (1) relating to subrogation were modified. It was provided:

"(7) In the case of a closed national bank or district bank, the corporation, upon the payment of any depositor as provided in paragraph (6) of this subsection, shall be subrogated to all rights of the depositor against the closed bank to the extent of such payment. In the case of any other closed insured bank, the corporation shall not make any payment to any depositor until the right of the corporation to be subrogated to the rights of such depositor on the same basis as provided in the case of a closed national bank under this section shall have been recognized either by express provision of state law, by allowance of claims by the authority having supervision, of such bank, by assignment of claims by depositors, or by any other effective method. In the case of any closed insured bank, such subrogation shall include the right on the part of the corporation to receive the same

dividends from the proceeds of the assets of such closed bank and recoveries on account of stockholders' liability as would have been payable to the depositor on a claim for the insured deposit, but such depositor shall retain his claim for any uninsured portion of his deposit." (12 USCA, § 264.)

Under the 1935 law FDIC is subrogated only to the extent of its payment to the depositor. This results in a split claim, the depositor retaining such portion of his claim as was uninsured and thus being permitted to share with FDIC in all dividends declared.

It seems clear to us that we are dealing with a right of subrogation created and limited solely by statute. It will not do to discover analogies between the FDIC and an ordinary surety or to borrow and apply indiscriminately the general principles governing subrogation in equity. The statutes have sufficiently defined and fixed the scope and extent of the rights of FDIC and, at least in the case of state banks, have made them a condition to the depositor's right to have his insured deposit paid. Under the law in effect when the bank closed, FDIC is subrogated to the full deposit claimed; under the 1935 law, it is subrogated only to the extent of its payment. The question is which law is to be applied.

Appellants, drawing upon the general principles of subrogation, seek to fix the rights of FDIC as of the time of payment. It is of course true that the rights to subrogation ordinarily come into being upon payment by a surety and not when he sustains an undischarged liability. *Heller v. Shapiro,* 208 Wis. 310, 242 N. W. 174; *Luce v. Fidelity & Casualty Co.* 222 Wis. 50, 268 N. W. 131. Appellants recognize that this court has occasionally characterized the right of subrogation before payment as an inchoate right and considers this to be unfortunate language but insists that at all events the legislature may modify or take away this inchoate right. *Leach v. Commercial Savings Bank,* 205 Iowa, 1154, 213 N. W. 517. The general rules contended for by appellants are too well established to warrant extensive citation in

support of them. However, the right of subrogation involved here is a statutory right and its scope and the limitations upon it are to be looked for in the statute at least before attempting the application of any general principles. In the 1935 act, paragraph (1) of subsection (1) of sec. 12B provides:

"The temporary federal deposit insurance fund and the fund for mutuals heretofore created pursuant to the provisions of this section are hereby consolidated into a permanent insurance fund for insuring deposits, and the assets therein shall be held by the corporation for the uses and purposes of the corporation: *Provided, that the obligations to and rights of the corporation, depositors, banks, and other persons arising out of any event or transaction prior to August 23, 1935, shall remain unimpaired.*" (12 USCA, § 264.)

Upon events and transactions which occurred prior to August 23, 1935, the depositors had a right to have their insured deposit paid, subject to the condition that FDIC be subrogated to their entire claim in accordance with the provisions of the 1933 law. These rights were certainly intended to be maintained by this clause in their full integrity and without change either in scope, limitation, or condition. The rights of the corporation were expressly reserved, whether inchoate or vested, and we discover no purpose to change the rights of subrogation of the corporation in any situation where the conditional rights of the depositors, as well as the obligations of the corporation, had matured under the earlier law prior to August 23, 1935. We are fortified in this conclusion by the objectives of the act as indicated by the report of the committee of banking and currency on the 1933 act. The report states:

"The bill does not provide that the government shall guarantee the payment of deposits; but it does provide and require that the banks under government supervision and regulation shall mutually guarantee the deposits of each other through the medium of a government controlled instrumentality designed for that purpose."

The great concern of congress was to keep the plan solvent, and the subrogation features of the act are devices for this purpose and are not fundamentally grounded upon the equitable considerations giving rise to the general doctrine of subrogation.

Seeking to avoid application of the principles heretofore stated, it is contended in the brief of appellant Auto Acceptance Corporation that due to the procedural steps in the liquidation proceedings, the insolvency of the bank must be dated from October 9, 1935, and that therefore the rights and obligations of the parties arose as of a date subsequent to that upon which the 1935 act took effect. As heretofore stated, the bank was closed by the bank examiner and possession taken by the commission on June 4, 1935. The directors of the bank applied to the banking review board to review the action of the commission in taking possession. This was done under sec. 220.08 (9), Stats. After an adverse decision by the banking review board on August 23, 1935, the directors then brought an action in the circuit court for Milwaukee county to enjoin further proceedings on the part of the commission. The adverse ruling of the circuit court for Milwaukee county was on October 5, 1935, and its determination was that the bank was insolvent on June 4, 1935. Appellant contends that sec. 220.035 (3) governs, and that since upon a review by the circuit court of the determination of the banking review board the section permits the court to receive additional evidence and in effect grant a trial *de novo,* the respective rights of the parties are to be considered to have been determined as of the time of final determination by the court. This contention cannot be sustained. In point of fact the proceedings were under sec. 220.08 (9) and not under sec. 220.035 (3), but this is probably immaterial as in either event evidence may be adduced before the court. The important consideration is that the circuit court actually adjudicated that the bank was insolvent

on June 4, 1935, and that the commission had a right to take possession of it on that date. Under the federal act the obligations of FDIC and the rights of depositors arise when a member bank is closed on account of inability to meet its deposit liabilities. The adjudication that the bank was insolvent and unable to meet its deposit liabilities on June 4, 1935, was a judicial declaration that the rights and liabilities arose as of this date. Had the 1935 act completely repealed the earlier acts, abolished the FDIC, and abrogated the entire system of deposit insurance, it could not have been successfully contended that the rights of the depositors in the Anchor State Bank did not arise until after the repeal.

It is also contended that the subrogation provisions of the banking acts of 1933 and 1934, if given the construction contended for by FDIC, are unconstitutional in that they constitute an "unwarranted usurpation by the legislature of the functions and powers of the judiciary" in several respects. We are of the opinion that appellants are not in a position to urge the invalidity upon constitutional grounds of those parts of the act dealing with subrogation. What congress has done is simply to put a limitation upon the amount of insurance offered and to condition this insurance upon certain subrogation rights in FDIC. The depositor is not compelled to accept the benefits of the act if the disadvantages outweigh them. Neither is he prevented from so distributing his deposits as not to leave more than $5,000 in any one bank. Having accepted the benefits of the act and received the amount of his deposit insurance, he has no standing to question the constitutionality of the subrogation features of the act.

"It is a general principle that one may not enjoy the benefits and privileges of a statute and, after so doing, escape its burdens by attacking its validity."

*Voluntary Assignment of Tarnowski*, 191 Wis. 279, 284, 210 N. W. 836. See also *Booth Fisheries Co. v. Industrial*

*Comm.* 185 Wis. 127, 200 N. W. 775; same case, 271 U. S. 208, 46 Sup. Ct. 491, 70 L. Ed. 908; *Daniels v. Tearney,* 102 U. S. 415, 26 L. Ed. 187; *Grand Rapids & I. R. Co. v. Osborn,* 193 U. S. 17, 24 Sup. Ct. 310, 48 L. Ed. 598. This doctrine applies with greater force where the portion of the act objected to as unconstitutional is a condition to the exercise of the benefits which have been accepted by the person seeking to raise the constitutional point. We discover no error in the disposition of this case by the trial court.

*By the Court.*—Order affirmed.